Gregory A. LE FEBVRE, a minor, by and
through his mother and next friend,
Janet L. LeFebvre,
and
Janet L. LeFebvre
v.
UNITED STATES of America.
Civ. No. 11235.

United States District Court
D. Maryland.
Nov. 3, 1959.

J. Robert Carey, Washington, D. C.,
and Richard H. Love, College Park, Md.,
for plaintiffs.

Leon H. A. Pierson, U. S. Atty., and
William J. Evans, Asst. U. S. Atty., Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

The evidence in this case under the
Tort Claims Act, 28 U.S.C.A. § 2671 et
seq., raises two close questions: whether
the accident was caused by any negligence of the driver of the mail truck;
and whether the infant plaintiff is likely
to have epileptic seizures in the future,
although he has had none in the past.

### I.

McComas Ave., in Kensington, Md., a
suburb of Washington, D. C., runs east
and west. It is a smooth asphalt macadam road, 24 ft. wide, with no sidewalks
on either side, but with 22 in. concrete
gutters on each side. Farragut Road,
also about 24 ft. wide, runs north into
McComas Ave., forming a T-intersection. There is a "medium" down grade
on McComas Ave. going west from about
300 ft. east of Farragut Road to St. Paul
St., the next street west, where there is
a stop sign. There are houses with spa-

cious lawns on the south side of McComas Ave. on both sides of Farragut Road. On the north side of McComas Ave., beginning about 45 ft. east of the east side of Farragut Road, there is a fence, about 10 ft. from the gutter, which continues far beyond the west side of Farragut Road. Between the gutter and the fence there are many bushes, interspersed with overhanging branches from trees and bushes inside the fence. On May 12, 1958, this foliage made it difficult for a motorist proceeding west on McComas Ave. to see anyone standing in the foliage more than two or three ft. from the gutter. A pole of the Potomac Electric & Power Company is located three ft. north of the gutter on the north side of McComas Ave., three ft. west of the west curb of Farragut Road.

On May 12, 1958, at about 5:30 p. m., Gregory LeFebvre, the infant plaintiff, 4½ years old, was playing on the lawn on the southwest corner. Dennis Lemmon, then about 11, was knocking a croquet ball about with a mallet, and two other boys, aged 6 or 7, were running after the ball, with Gregory following them. On one occasion the ball crossed McComas Ave. and lodged in the bushes near the fence. All four boys went across the road to look for it, and finally found it. Dennis then drove the ball back toward his lawn, but it caught on a rag in the middle of the road. Gregory, who had been standing by the "Pepco" pole, about three ft. back from the gutter, started to run after it. Dennis saw the mail truck near the east end of the fence, some 60 ft. away, and called out to Gregory, who stopped 5 or 6 ft. from the gutter, just before the truck hit him. The truck knocked Gregory down, and then pushed or dragged him about 18 ft. He lay near the rear axle, just inside the right rear wheel, 12 ft. behind the front bumper, after the truck came to a stop with its front bumper about 30 ft. from the point of impact.

The truck was a one-ton mail truck, with a seat for the driver on the left. Shull, the driver, was a senior at the University of Maryland, who worked Monday to Friday from 5:00 to 7:30 p. m., collecting mail on a fixed route in Kensington, with longer hours Saturday and Sunday. He had driven down McComas Ave. every day for several months. The truck was in good condition. When Shull reached the top of the grade on McComas Ave. going west, he put his foot on the brake and started down the hill at 20 to 25 miles per hour. He was on the right side of the road, with the right side of the truck 4 or 5 ft. from the gutter. He noticed some children playing on the lawn on the southeast corner, and slowed down further, to between 15 and 20 miles per hour. He testified that he was watching the road, "pretty much to the front", but could see both sides. He proceeded across the intersection and was within a foot or two of the west curb line of Farragut Road, if extended, when he saw Gregory in front of his truck, just before the impact. He had not seen any children on the north side of McComas Ave., between the road and the fence, nor on the southwest corner. He could not say whether Gregory was standing still or running. He applied his brake promptly and brought the truck to a stop in 30 ft., without leaving any skid marks clear enough to measure. Allowing for only a short reaction time [1] and for average braking distance, he could not have been going much over 15 miles per hour.

Despite the foliage, in the exercise of ordinary care, he should have seen Gregory when the child was 2 or 3 ft. north of the gutter and the truck was nearly 60 ft. away. The child proceeded 2 or 3 ft. to the gutter, 2 ft. across the gutter and 5 or 6 ft. out into the street, a total of about 10 ft., before he was hit. He was running part of the time but stopped before he was struck. The truck traveled at least 50 ft. after

[1]. Because he already had his foot on the brake. Allowing the average reaction time (½ second), the practical stopping distance for a truck going 15 miles per hour is about 30 ft.

the boy was clearly visible, running into the road.[2] Since the driver could and did stop his truck within 30 ft., I find that in the exercise of ordinary care he could and should have stopped his truck without hitting the child after he could and should have seen the child starting to run across the street.

I am mindful of such Maryland cases as Olney v. Carmichael, 202 Md. 226, 96 A.2d 37; Cocco v. Lissau, 202 Md. 196, 95 A.2d 857; Johnny's Cabs, Inc. v. Miller, 199 Md. 16, 85 A.2d 439; and Bond v. Forthuber, 198 Md. 476, 84 A. 2d 886. The question is certainly close, but applying the principles announced in those cases, and followed in Mumford v. United States, D.C.D.Md., 150 F.Supp. 63, I find that negligence on the part of the truck driver was a proximate cause of the accident.

 Under Maryland law a child four years old cannot be guilty of contributory negligence. Miller v. Graff, 196 Md. 609, 78 A.2d 220. In any event, this child acted as a normal[3] 4½ year old boy would act. There was no negligence on the part of the parents. Most suburban parents allow their 4 year old boys to play with their neighbors' children on their neighbors' lawns after warning them not to run into the roads.

## II.

 There is no evidence that the child was unconscious for any appreciable period after the accident. Neighbors tried to quiet him until his mother arrived, and he was taken to Suburban Hospital in an ambulance. His pediatrician enlisted the services of a neurosurgeon. In addition to the head injuries, discussed below, the child had fractures of the left humerus, the left ulna, the left ischium and the right clavicle, with no displacement of any of the bones, all of which healed quickly without permanent disability. He also had multiple contusions and abrasions, a probable lower nephron nephritis, and damage to two front baby teeth, all of which healed promptly without any residuals.

He had a compound[4] linear fracture of the skull, 9 centimeters long, in the left fronto-parietal region, a cerebral concussion, and a subarachnoid hemorrhage. The fracture was not significantly depressed, that is, it did not impinge upon the underlying brain. The doctors are agreed that the subarachnoid hemorrhage was probably caused by the rupture of a small blood vessel in the area between the arachnoid (the membrane immediately under the dura and the skull) and the pia (the membrane covering the brain proper). This hemorrhage caused a small amount of blood to be in the spinal fluid and to raise the pressure therein temporarily, but it has healed without present disability. There is probably some scar tissue at the site of the hemorrhage which is not serious if it is in the subarachnoid area, as all the doctors think it is. Such scar tissue will not grow and cause pressure on the brain in the future. It is possible but highly improbable that the hemorrhage occurred in the brain itself, as the result of a cerebral laceration, which might leave a scar on the surface of the brain. A scar on the brain itself would be likely to produce seizures at some future time.

After the initial shock the child was in a state of compensated concussion, with fever, until 12 days after the accident. He was lethargic, but thrashed about when aroused. A spinal tap was performed after about a week. The doctors decided against surgery, and against sedation, since they wished to watch him closely. After 12 days his fever disappeared, and on the fourteenth day he left

---

2. The boy's average speed over the 10 ft. was probably not over 3 miles per hour if allowance is made for starting, stopping and standing even momentarily. The truck's speed was therefore at least five times the average speed of the boy.

3. A prudent 4 year old boy would be an unattractive anomaly.

4. I. e. with a laceration of the scalp down to the site of the fracture.

the hospital, looking fine, but limping slightly.

He had no coma and no seizure immediately after the accident or during convalescence. After coming home he walked shakily for a while, needed a great deal of rest, and was nervous and irritable. He entered kindergarten in the fall of 1958, but his attention span was short and he tended to disrupt his class. He has done better this year in the first grade. He has been excitable, over-active and hard to manage, but he has had no convulsions, no muscle weakness or disability of the locomotor system, and no other cerebral nervous system symptoms except those mentioned above. He behaved normally for a 6 year old boy during his day in court.

Plaintiffs' and defendant's doctors are agreed that all of the clinical findings, including those obtained in the neurological examinations, are negative.

Five electroencephalograms (EEGs) have been made, in June, 1958, September, 1958, June, 1959, and October, 1959, at the office of plaintiffs' neurosurgeon, and in October, 1959, at the Walter Reed Army Center. In June, 1958, one of plaintiffs' doctors prescribed Dilantin, a drug whose purpose is to prevent convulsive seizures. This drug had some bad effects. It was discontinued in September, 1958, and the child took no drugs until July, 1959, when small doses of phenobarbital were prescribed.

There was a notable difference between the testimony of plaintiffs' pediatrician and plaintiffs' neurosurgeon with respect to who prescribed what drugs and when, and when and why they were discontinued. Both of plaintiffs' doctors impressed me as being essentially honest, but both of them stretched their opinions to the limit to favor plaintiffs' case. On the other hand, the doctors from Walter Reed were most impressive for their fairness as well as for their ability. In the narrow but important area of conflict, the interpretation of the EEGs and the probability of future seizures, I accept the evidence of the government doctors.

Plaintiffs' neurosurgeon testified to certain abnormalities which he found in the EEGs. Defendant's EEG expert explained these alleged abnormalities as being due to the child's age, the fact that he had been taking phenobarbital, and other causes. The Walter Reed EEG carried a simultaneous electrocardiogram (EKG), which explained some of the alleged spikes. I find that the EEGs are essentially normal for a child 5 or 6 years old and that the possibility of future seizures is slight, although of course greater than if the child had not had the accident. Defendant's expert conceded frankly that another doctor could honestly read the EEGs differently, although in the opinion of the witness such a reading would be wrong. But even if the EEGs be read as plaintiffs' doctor reads them, defendant's doctor is of the opinion that the chance of epilepsy is near the lower limit of the range of probability—not much greater than two and one-half percent.

In sum, the child had the injuries set out above, from which he has recovered without disabling residuals. He and his parents have had a difficult time, but his nervous condition seems to be improving; no doctor predicted any permanent character change or permanent nervous condition. There is some possibility of seizures in the future, but it does not exceed five percent.

The medical bills and other expenses total about $1,250. Judgment will be entered for $6,250 in favor of the infant plaintiff and for $2,500 in the parent's case to cover present and future medical expenses.